# CASES

## ARGUED AND DETERMINED,

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### COLUMBIA AGRICULTURAL CO. v. SEID PAK SING.

### SEID PAK SING v. COLUMBIA AGRICULTURAL CO.

(Circuit Court of Appeals, Ninth Circuit. September 7, 1920. Rehearing Denied October 28, 1920.)

#### No. 3469.

1. **Landlord and tenant ⬤➡136—Lease held to require lessor to pump water from land.**

    A lease of agricultural land within a drainage district, which required the lessor to keep the drainage canals open and clean, to reimburse lessee for loss of crops from flooding by break in levees or rise of water table, to pump water from the land at seeding time, and to pay the pumping charges levied against the land, requires the lessee to pump at times other than seeding time the water from the pump into which the drainage canals emptied, which was necessary to enable those canals to perform their function.

2. **Appeal and error ⬤➡1001 (1)—Verdict supported by evidence not reviewable.**

    Issues submitted to the jury under proper instructions, on which there was evidence to support the verdict rendered, are finally determined by the verdict, and the appellate court will not review the testimony.

3. **Trial ⬤➡296 (2)—Instruction held not error, in view of another instruction.**

    An instruction, under a lease of agricultural lands which required the lessor to maintain the drainage of the lands, that the drainage should be maintained so that the lands would be in the ordinary condition of uplands or flat lands not needing drainage, was not error, where the court also instructed as to the lessee's duty to maintain ditches on the land and to cultivate his crops properly, and denied recovery if the jury found negligence by the lessee.

4. **Landlord and tenant ⬤➡129 (4)—Lessee, whose performance was prevented, can recover, after rescission, expenditures before breach.**

    Lessee of a tract of agricultural land, whose performance of the lease was prevented by breach of lessor's contract to erect buildings on the land and deliver possession, can, after rescinding the lease, recover from lessor expenditures by him before the rescission in preparation for the cultivation of the land.

---

⬤➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

267 F.—1

  5. **Landlord and tenant ⬤⇒49(2)—Lessee, after lessor's breach, can recover expenditures by action for breach of contract.**
     Where lessee's performance of his contract was prevented by breach of lessor's agreements, lessor can, after rescinding the contract, recover his expenditures in preparation for performance thereof by an action for breach of contract.

  6. **Landlord and tenant ⬤⇒200(1)—Lessee, using only part, is liable for rent of entire tract.**
     One who leased a stated number of acres, which were to be set apart to him from a larger tract at a fixed rental per acre, is liable for the rent of the number of acres stated, and which were available for his use, though he actually used only a portion thereof.

In Error to the District Court of the United States for the District of Oregon; Charles E. Wolverton, Judge.

Action by Seid Pak Sing against the Columbia Agricultural Company. Judgment for plaintiff for part of the amount claimed, and both parties bring error. Affirmed.

This was an action for damages for breach of contract, with a verdict in favor of plaintiff below. A judgment was entered upon the verdict. Cross-writs of error were sued out.

On March 2, 1917, the defendant, Agricultural Company, leased to the plaintiff, Sing, a Chinaman, certain lands for agricultural purposes; the lease reciting that the company owned certain diked lands in certain drainage districts in Oregon, which lands "are protected from overflow by levees and a drainage system thereon operated by said districts, sufficient for protection under ordinary circumstances." Tract 1 was described as 400 acres of land in the Midland and Magruder drainage districts, and was leased for the year 1917, commencing with the date of the lease, and ending December 31, 1917, rental to be $9 per acre, or $3,600. Tract 2 was 3,000 acres in the Beaver drainage district, the lease to run for four years from January 1, 1918, rental to be $9 per acre, or $27,000. It was agreed in the lease that no rent should be called for until the lessee was given actual possession of the land and every part thereof, the land to be "in a condition suitable and ready for the work to be performed thereon by said lessee and suitable for the purposes for which he is leasing said premises."

Lessee covenanted with Sing, among other things, that the lessee (5) "will use and occupy said leased premises for general farming purposes, and will at all times cultivate the same in a first class husbandlike manner," etc.; (7) will at all times during said lease, at his own expense, keep the irrigation ditches on said lands clean and open; lessor to keep main drainage canals open and clean. "Lessor guarantees to said lessee the following: (1) That if during the term of this lease the levee should break and emit water upon the said leased lands, or if the water table should rise by reason thereof, or from seepage, to such an extent as to injure or destroy the crops planted thereon, or on any part of said premises of lessee, lessor will reimburse said lessee for the actual expense of the seeding and cultivating of said lands to said time, not to exceed $20 per acre, and said lessee shall not be required to pay rental for that portion of the land on which crops may be so injured or destroyed, as aforesaid, during the year in which said land is so flooded or such crops are so injured or destroyed. (2) To pump water off and to drain said lands, so that the same will be at a depth of approximately 4 feet below the surface of the land at seeding time, which depth of water is about one foot above the zero mark of the district, and which is estimated at the proper depth for the best seeding of said land. * * * (10) To construct an additional main drainage canal in the Beaver drainage district so as to afford additional drainage of said lands. (11) To pay the pumping charges, assessments, and taxes which may be levied against said lands."

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

The first cause of action was for damages to 40 acres of potatoes destroyed by flood water and for certain moneys paid out by plaintiff to 46 employés hired to harvest the potatoes in the acreage included in tract 1. The basis of the first cause of action is that there was an obligation resting upon the defendant to keep open the main canal and drain the land in the fall and winter of 1917.

In connection with the second cause of action, which pertains to the lease of tract 2, or the 3,000 acres in the Beaver drainage district, the lessor agreed to provide and build buildings upon each 500 acres of land in the district, at places to be thereafter mutually agreed upon by the parties to the lease. In this cause the plaintiff pleaded failure to deliver possession, and sued for expenses incurred in sending men and machinery from San Francisco to Oregon to prepare the lands in the tract for farming, and for the expense of returning the men and machines to San Francisco after defendant refused to deliver possession.

In answer to the first cause of action defendant set up that the lands prior to December 21, 1912, were swampy and unfit for cultivation, and that it had constructed a large levee and dike around the Midland district lands, and had built dams and dikes and tide gates, and had installed a pumping plant and a general system of drainage to reclaim the lands; that thereafter, when the drainage system was constructed, the defendant had sold the lands in the Midland district to one Magruder, and that the deed of sale embraced conditions running as covenants whereby the land should be sold to purchasers, who would agree to associate themselves with other property owners as the Midland drainage district. It is averred that Magruder sold the lands to defendant, and defendant sold tracts whereby the purchasers acquired, subject to the conditions and reservations which had been incorporated in the deed to Magruder; that thereafter the Midland drainage district was organized, trustees were elected, and the trustees, since January 25, 1913, had had exclusive charge of the dikes and drainage system and pumping of the water within the district.

It is alleged that before the lease in question was made the plaintiff herein knew all of the conditions with respect to the covenants referred to, examined the lands, knew their character, and was familiar with climatic conditions, and the condition of the dikes and pumping plant, and the plan of drainage. Defendant pleads that the proximate cause of the damage, if any there was, to the potatoes grown by plaintiff upon the land, was the negligence, omission, and failure of plaintiff to harvest the crop "in due course of husbandry," and that the crop was ready for harvesting weeks before any damage was done by rainfall or surface water. Defendant also pleads that, when the rainy season set in, the rainfall was so heavy that no amount of pumping would have removed sufficient water from the land to render it practicable to dig the potatoes, and that pumping would have been ineffectual.

With relation to tract 2, the 3,000 acres leased, defendant pleaded the plaintiff notified defendant that he could not finance so large a matter during the season of 1918, and that by mutual consent in December, 1917, the parties abandoned and rescinded the lease with respect to the 3,000 acres, and thereafter negotiations were had for a new contract for a smaller number of acres, but that no such contract was ever made, and the things done by plaintiff were with full knowledge that they were not being done under the terms of the contract "so rescinded as aforesaid," but were done with the expectations that he would be able to make a new contract for a smaller number of acres for 1918.

The defendant set up a counterclaim, and alleged that the plaintiff selected 400 acres, tract 1, of the lands, for which he agreed to pay $9 per acre, or $3,600, rental by December 31, 1917, but that he had only paid $2,000, which had been deposited on account of rentals for 1918 for tract 2, which was the 3,000-acre tract, but that in December, 1917, cancellation by mutual consent had been had upon that tract, and that the $2,000 had been applied and credited by the defendant upon the lands in the Midland district. The court instructed the jury that the defendant was entitled to recover $1,600 from

the plaintiff, which should be set off against any amount found due plaintiff from defendant. This $1,600 was the difference between $3,600, rental of 400 acres in tract 1, and $2,000 found to have been paid. There was also an item of $1,558.40, which was admitted to be due by plaintiff to defendant.

The verdict of the jury was for $2,024.93, which sum would appear to have been reached by verdict in favor of plaintiff on both causes of action in the aggregate sum of $5,183.33, less items of $1,600 plus $1,558.40, which the court charged the jury to deduct as properly to be credited to the defendant.

The Agricultural Company contends that the judgment should be reversed, and that there should be a direction to the District Court to render judgment in its favor for $3,158.40 and interest; while Sing contends that the judgment in his favor should be affirmed in the sum of $2,024.93 and interest, but that there should be a reversal of the judgment of the District Court as to the item of $1,600 rental, and that he should be allowed that additional sum, with interest.

Robert R. Rankin, of Portland, Or., and Sterling Carr, of San Francisco, Cal., for plaintiff.

Russell E. Sewall and Guy C. H. Corliss, both of Portland, Or., for defendant.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). The contention of the agricultural company is that the court should have directed a verdict on the ground that plaintiff could not recover either for damages to the potato crop, or for damages on account of expenses incidental to sending men from California to Oregon to work on tract No. 2.

Error is also assigned upon an instruction to the jury to the effect that it was the duty of the defendant to drain the land so that it would be susceptible of cultivation and in such a condition that the potatoes could be harvested; that it was its duty to put the lands in like condition as upland is naturally, or ordinary level land that is drained by natural sources or natural drainage ways; and that the people who were farming in the drainage district—

"ought to be placed in the same condition that people are in who are farming upon upland or the ordinary level lands, or even the flat lands that are not drained by special drainage construction like a district of this kind."

The court added:

"Now that gives you the idea of what the defendant was required to do for the protection of the plaintiff in this case, in so operating those pumps as to keep the drainage canal open, so that the water would naturally flow from this land into the sump and thereby be carried away from the land."

[1] Defendant concedes that there was an obligation upon the lessor to pump the water off in the spring, so as to fit the land for seeding, but argues that there was no obligation of any kind to operate the pumps late in the fall and early in the winter, and that to hold that defendant should have taken care of water which the tide gates did not take off would be to interpolate into the lease an additional agreement never made nor intended by the parties. But we cannot agree to such a construction of the contract. On its face the lease referred to the lands as protected from overflow by two means—levees and a drainage

system thereon, of a character sufficient for protection under ordinary circumstances. Again, it was "expressly" agreed that Sing was not to be called on for rent until the lands and every part thereof were in condition suitable and ready for the farming work to be performed—general farming, which plainly included raising of potatoes. Thus far, by plain understanding the lands leased were protected by a drainage system, and were to be turned over in condition fit for raising farm produce and were to be used by the lessee for farming purposes.

When we look at the duties assumed after possession should be had, we have the obligation on the part of Sing to continue "at all times" during the lease to keep the irrigating ditches open, and on the part of the company to keep the "main drainage canals open and clean." Just as it was the duty of Sing to keep the irrigating ditches open and clean, so was it the duty of the company to keep the main drainage canals open and clean. Such duties were continuous, and from each to each. Next came the special provision by way of assurance whereby, in the possible event of a break in the levee, or a rise in the water table by reason of seepage to an extent to injure planted crops, the company was to reimburse Sing for expense, not alone of seeding, but also for the cultivation of the land to the time of injury, and would release him of rental for the acreage on which the crops might have been injured or ruined. Furthermore, as throwing light upon the true construction of the lease, we have the agreement on the part of the company to pump the water off and drain the land, so that there may be the proper depth for the best seeding, and that the company would construct an additional main drainage canal in tract 1, "so as to afford additional drainage" of the land.

The essence of these agreements was that the Agricultural Company would use the means and methods referred to, not only to put the lands in suitable condition for farming purposes at the time that they were turned over to Sing, but that during the time of the lease the company would keep the main drainage canals open and clean, and also construct an additional main drainage canal to afford additional drainage. As the evidence shows the lateral ditches ran into the main drainage canals, obviously it was necessary that such main drainage canals should be kept open and clean, in order that the water might find its way to the sump from which the tide gates emit the water, and from which excess water was pumped over the levee. By keeping in mind the language we have referred to as employed in the lease, and the carefully imposed obligations therein assumed by the parties, and regarding the covenants entered into as pertaining to the leasing of lands to be drained so as to be fit for cultivation and general farming, we are very clear in the opinion that the duty of the company was to keep the main drainage canals so as to remove the surplus water to the end that the land might be used for the purposes for which it was leased.

[2] Whether the plaintiff performed his duty, and kept the smaller ditches open and clean, to the end that the water therein could drain from his lands into the main drainage canal, was one of the questions

tried in the case, as was the larger question whether or not Sing farmed properly and with ordinary skill, and whether he planted and harvested at proper times. These issues were all submitted to the jury under careful instructions of the court, and as there is ample evidence to support the verdict in favor of the plaintiff, the lower court properly submitted the case to the jury, and this court will not review the testimony in support of the verdict.

[3] Referring specially to the instruction complained of, it should be read in connection with the main parts of the charge. When we do so, we find no possible prejudice to the rights of the defendant company. The court instructed that it was the duty of Sing to keep the lateral ditches open, in order that there might be afforded a regular drainage system through the lateral ditches into the main canal; that if Sing were negligent in planting his potatoes, or if he negligently allowed them to mature so late as to prevent the crop being saved, because they would not mature under natural conditions, then he could not recover; that under the lease there was no obligation on the company to furnish any other facilities for draining the rainfall from the land on which the potatoes were growing into the main ditches, except the small drainage ditches which were on the land when the lease was made; and that if Sing were negligent in keeping the laterals open he could not recover, but that the defendant was under an obligation to keep the large canals open, so that the water would flow to the sump and out of the sump to such lower depth that the drainage canal would operate to carry the water constantly to the sump, and thereby the water might be drained into the canals by the lateral ditches. The jury were told that they could consider the manner in which the potatoes were planted and hilled, the location of the small drainage ditches, the volume and frequency of the rainfall, height of water in the main drainage ditch during the time of the rainfall, and up to the time the crop was destroyed by water.

In the second cause of action, which has to do with the 3,000 acres in the Beaver district, plaintiff sued for damages caused by the failure of defendant to deliver possession of the land. As already stated, there was a provision in the lease for the erection by the company of a set of buildings upon each 500 acres of the leased land, the buildings to be erected at such places as might thereafter be mutually agreed upon by the parties to the lease; also a provision that the rental of the Beaver district land should not commence to run until January 1, 1918, although possession was to have been taken on or about the 1st of August, 1917—the lessee agreeing to prepare the ground for the next year's crops. Sing testified that he saw a representative of the defendant company about October 10th, and asked him to put up the buildings in the Beaver district, and that the agent of the company said he was going to put them up pretty soon. Sing also said that he talked again with him in November about the buildings, but no building was started until just before Christmas 1917. In November, 1917, Sing wrote to the defendant that he had been disappointed in promises of people to take up the whole 3,000 acres, and that he believed that he would be able to cultivate only about 1,500 acres during the ensuing

year, and he wanted a directors' meeting called to sanction him in cultivating 1,500 acres during the coming year.

There is evidence to the effect that Sing met an agent of the defendant and agreed that the 3,000 acres should be cut up into 500-acre tracts, that improvements were to be made upon each of such tracts, and that this should be done in order that Sing might take possession and go ahead with the work. Plaintiff's evidence tended to show that the company did not do any work on the land and did not build the buildings, further than to put material upon the ground. There is evidence that the land of the Beaver district was flooded with water late in December and was in no condition for farming, and that on January 5, 1918, Sing notified the company that, in view of the failure to perform the conditions of the lease with respect to building certain buildings and to perform certain other work, he would cancel the lease. In that same letter Sing advised the company that the called-for $3,600 rental for 1917 was for 400 acres, but that, inasmuch as the company had only turned over to him 200 acres, the rental should not exceed $1,800, and that, as the company then had in its possession $2,000 of his money, there was a credit with them in his favor of $200, which amount he asked the company to return to him. To this letter an agent of the company replied that the directors would meet on the following Friday, when his letter would be submitted, requesting Sing that he write his proposal to rent smaller acreage in the Beaver district and his wishes regarding lands in the Midland camp.

[4] It is contended by the company that there was a voluntary rescission of the lease, whereby Sing escaped all possible liability for any going on with the contract and all risk of carrying out the lease for the next four years. The view taken by the learned judge of the District Court was that, notwithstanding the rescission as to the 3,000-acre tract, Sing was entitled to be put in statu quo, and that in order for him to be so put he should be paid for such expenses as he may have been put to in bringing men to the ground and transporting implements for the purpose of taking possession and working the lands: Provided, the company had broken the agreement it had entered into by not having put the lands in condition for the plaintiff to take possession of them. The court added that Sing could not recover unless there was such breach.

The general principle embodied in the instruction of the court was correct. In United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168, it was held that where one has voluntarily and wrongfully put an end to a contract, he cannot be heard to say that the party injured has not been damaged at least to the amount of what he has been induced in good faith to pay out and expend after making allowance for the value of the material on hand; that the one in default cannot say this, unless he can show that the expenses of the party injured have been extravagent and unnecessary for the purpose of carrying out the contract. Justice Bradley, for the court, said:

"The distinction between those claims under a contract which result from a performance of it on the part of the claimant, and those claims under it which result from being prevented by the other party from performing it,

has not always been attended to. The party who voluntarily and wrongfully puts an end to a contract and prevents the other party from performing it is estopped from denying that the injured party has not been damaged to the extent of his actual loss and outlay fairly incurred."

[5] The Behan Case also disposes of any suggestion that there can be no recovery under the pleading of the second cause of action, because it is based upon the theory of a breach of contract, in that the court held that the particular form of the complaint ought not to preclude claimant from recovering what was fairly shown by the evidence to be damage sustained by him by way of losses for outlay and expenses.

Alabama Oil & Pipe Line Co. v. Sun Co. (Tex. Civ. App.) 90 S. W. 202, turned largely upon the particular facts discussed by the court, which held that there never was any intention on the part of the plaintiff in that case to reserve the right to hold the appellees for damages for precedent breaches of the contract, and that the appellee had a right to assume that whatever results the law attached to an unreserved and unconditional cancellation were in contemplation by the appellant, and that under the facts appellant waived all right to recover damages for the breach of the contract by the appellee.

It may be that the rule in the Behan Case goes farther than that stated in the decisions cited by defendant, but, by the authority of the Behan Case, Sing, having shown himself substantially entitled to relief, should not be denied recovery of the claim for losses sustained by outlay and expenses. United States v. Molloy, 127 Fed. 953, 62 C. C. A. 585.

[6] By writ of error sued out by Sing the question is whether the court erred in instructing the jury to this effect: That the company had pleaded as a set-off that Sing rented 400 acres of land in tract 1 from the defendant, and agreed to pay $9 per acre, or $3,600; that $2,000 had been paid thereon, leaving due the company from Sing $1,600; that as a matter of law the company was entitled to recover $1,600 from Sing, and to have that amount set off against any amount that the jury might find was due to Sing from the company.

The lease, as already shown, called for 400 acres, tract 1, for 1917, at $9 per acre per annum, the land to be selected by Sing, his selection to be made known to the lessor. There were provisions respecting no rental until the possession was given, and an agreement respecting measurement of the tracts. There were also provisions which we do not think it necessary to set forth, as the real point is whether Sing was responsible for the rent for the full 400 acres at $9 per acre, or only for about 200 acres, the land actually used by him.

The lease, however, was a contract for the letting of 400 acres in the Midland district; and, considering the fact that the company turned over to Sing for selection 400 or more acres of tillable land, it became the duty of Sing to select the particular 400 acres he wished to lease, and then to notify the company. During 1917, if the crops were unsatisfactory, he had a right to cancel the lease of tract 1 upon paying to the lessor the further sum of $1,600. Sing made no claim in the farming season of 1917 that he had not been given the full 400

acres, or that he intended to pay only for such land as he actually used. He made a payment as required by the lease on August 1, of $720, or one-fifth of the whole rent, and thus recognized that he was liable for the full $3,600. He thereafter secured extensions of time for payment of further installments, but made no claim of exemption from liability for $3,600 rental. Nor did he ever make such a claim when the lease was canceled. Whether Sing used and farmed the 400 acres was not material, so long as they were turned over to him and were available for use by him.

We think the obligation to pay for the 400 acres was incurred and that the court was right in its ruling. As the record shows that neither party has been prejudiced by the judgment rendered, it will be affirmed.

So ordered.